# In the United States Court of Federal Claims

No. 09-587 C

Filed: February 27, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| SACRAMENTO MUNICIPAL UTILITY DISTRICT, | |
| Plaintiff, | Nuclear Waste Policy Act, |
| v. | 42 U.S.C. §§ 10101 *et seq.*; Recalculation Of Damages; |
| THE UNITED STATES, | Remand. |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Timothy R. Macdonald**, Arnold & Porter, LLP, Denver, Colorado, Counsel for Plaintiff.

**Christopher J. Carney**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

### MEMORANDUM OPINION AND FINAL JUDGMENT ON REMAND

**I.   RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY.[1]**

On September 4, 2009, Sacramento Municipal Utility District ("SMUD") filed a Complaint in the United States Court of Federal Claims for costs incurred from January 1, 2004 to December 31, 2009, as a result of the Department of Energy's ("DOE") breach of a June 14, 1983 contract between SMUD and DOE (the "Standard Contract"), required by the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101–10270 (2006).

The Standard Contract obligated DOE to begin to dispose of and store SMUD's spent nuclear fuel ("SNF") and high-level waste ("HLW") from Rancho Seco by January 31, 1998, and

---

[1] The factual background and procedural history are discussed in *Sacramento Municipal Utility District v. United States,* 61 Fed. Cl. 438, 439 (2004) ("*SMUD I*"); 63 Fed. Cl. 495, 496–98 (2005) ("*SMUD II*"); 70 Fed. Cl. 332, 336–56 (2006) ("*SMUD III*"); 74 Fed. Cl. 727 (2006) ("*SMUD IV*"); 293 Fed. App'x 766, 768–69 (Fed. Cir. 2008) (unpublished) ("*SMUD V*"); 91 Fed. Cl. 9 (2009) ("*SMUD VI*"); and *SMUD v. United States*, 109 Fed. Cl. 660, 663–70 (2013) ("*SMUD VII*").

to continue to do so until disposal was complete. *See* 42 U.S.C. § 10222(a)(5)(B).[2] In exchange for DOE's disposal and storage services, SMUD was required to pay a fee that was deposited in the Nuclear Waste Fund. *See* 42 U.S.C. § 10222(a)(5)(B).[3]

Over a decade ago, the United States Court of Appeals for the Federal Circuit held that DOE's failure to dispose of and store SNF and HLW generated by the nuclear-utility parties to the Standard Contract by January 31, 1998 was a partial breach thereof. *See Me. Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342–43 (Fed. Cir. 2000). To date, DOE has not disposed of or stored SMUD's SNF or HLW.

On October 24–27, 2011, a trial was held to ascertain the mitigation costs that SMUD was entitled to recover as damages from January 1, 2004 to December 31, 2009. Post-trial briefing and proceedings were not completed until December 4, 2012.

On March 12, 2013, the court issued a Memorandum Opinion And Final Order that determined:

• "SMUD is precluded from relitigating whether SNF would have been removed from Rancho Seco earlier than under the [Oldest Fuel First ("OFF")] schedule, by exchanges or otherwise," *SMUD VII*, 109 Fed. Cl. at 680;

• "SMUD would have shipped its Class B and C waste off-site in the non-breach world prior to or during 2008," *id.* at 681;

• "SMUD is entitled to $13,366,602 in mitigation costs incurred as a result of SMUD's [Independent Spent Fuel Storage Installation ("ISFSI")] operations and maintenance costs," *id.* at 684;

• "SMUD is not entitled to recover its [Nuclear Energy Institute ("NEI")] fees for the years 2004 through 2008," *id.* at 685;

• "SMUD is entitled to $371,880 for [American Nuclear Insurers ("ANI")] insurance premiums for 2009 and $92,342 for [Nuclear Electric Insurance Limited ("NEIL")] premiums for 2009," *id.* at 687;

• "SMUD is not entitled to recover the costs of the Cosumnes Power Plant explosion analysis," *id.* at 688;

---

[2] Section 10222(a)(5)(B) provides: "Contracts entered into under this section shall provide that in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1988, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter." 42 U.S.C. § 10222(a)(5)(B).

[3] Significantly, if SMUD declined to become a party to the Standard Contract, the Nuclear Regulatory Commission ("NRC") would not have renewed SMUD's nuclear operating license. *See* 42 U.S.C. § 10222(b)(1)(A).

- "SMUD is not entitled to mitigation costs to construct the wastewater treatment plant," *id.* at 689;

- "SMUD is entitled to $598,339 in mitigation costs for the [Rancho Seco renovation], and related operating expenses for 2009," *id.* at 691;

- "SMUD is entitled to receive $118,750 in mitigation costs for the [Nuclear Regulatory Commission ("NRC")] fees that SMUD paid in 2009," *id.* at 694;

- "SMUD is entitled to $659,886 for the portion of the claimed costs related to loading the [Greater-than-class-C ("GTCC")] waste into the ISFSI," *id.* at 700;

- "SMUD is entitled to $5,485,649 in mitigation costs for overhead," *id.* at 702;

- "the court must deny SMUD's claim for the cost of capital," *id.*;

- "The Government . . . is entitled to an offset of $34,987,913 for wet pool costs SMUD avoided from 2004 through 2008," *id.* at 708; and

- "SMUD is entitled to mitigation costs of $38,845,398 for the period from January 1, 1992 to December 31, 2009." *Id.*

On June 20, 2014, the United States Court of Appeals for the Federal Circuit reversed, vacated, and remanded the court's March 12, 2013 Final Order. *See SMUD v. United States*, 566 Fed. App'x 985, 996–97 (2014) ("*SMUD VIII*"). The appellate court held, "[b]ecause the trial court erred . . . by barring SMUD's exchange theory and declining to determine a specific fuel-out date, this court vacates the amount calculated as the [DOE] offset from 2004–2008, *i.e.*, $34,987,913, and remands that set of issues for further consideration consistent with this opinion." *Id.* at 996. It also "reinstate[d] the [December 30, 2009] award to SMUD of $53,139,863 for costs incurred to mitigate from January 1, 1992 to December 31, 2003, and direct[ed] the trial court to execute that prior judgment immediately." *Id.* at 997.

On August 13, 2014, two days after the mandate issued, the court directed the Clerk of Court "to enter final judgment in Case No. 98-488C in favor of [SMUD] in the amount of $53,139,863 for costs incurred from January 1, 1992 to December 31, 2003." Final Judgment Order, Case No. 98-488, Dkt. No. 451 (Aug. 13, 2014).

On August 14, 2014, SMUD filed a Motion To Recalculate Damages And For Entry Of Judgment ("Pl. Mot."). On September 8, 2014, the Government filed a Response ("Gov't Resp."). On October 1, 2014, SMUD filed a Reply ("Pl. Reply").

## II. DISCUSSION.

### A. Whether Further Proceedings Are Warranted.

SMUD argues that "both parties made a record on the fuel-out date so that they could avoid having to come back to court again if there was a remand. SMUD therefore requests that the [c]ourt issue final judgment based upon the record created at trial in October 2011." Pl. Mot. at 4.

3

SMUD contends that it "should not have to bear the burden, cost, and delay of having to re-try this case on top of the burden and cost it already suffers due to [DOE's] breach." Pl. Reply at 5.

The Government responds that the court, "depending on its factual findings concerning SMUD's exchanges theory and the final fuel out date, may require further information from the parties to determine any award of damages to SMUD." Gov't Resp. at 4. But, the Government concedes that the court, "as directed by the Federal Circuit and based upon the existing record, can make factual findings regarding the exchanges theory . . . and the final fuel out date[.]" Gov't Resp. at 4.

Accordingly, the court has determined that the record is sufficient to make the necessary determinations on remand.

### B. Whether The Department Of Energy Would Have Approved Exchange Markets.

#### 1. Plaintiff's Argument.

SMUD argues that "the Federal Circuit . . . has approved the same 'exchange model offered by the same [damages expert] Mr. [Frank] Graves' to determine the appropriate fuel-out date and award damages." Pl. Mot. at 4 (quoting *SMUD VIII*, 566 Fed. App'x at 991). In fact, the United States Court of Appeals for the Federal Circuit repeatedly endorsed Mr. Graves' testimony in its decision. *See SMUD VIII*, 566 Fed. App'x at 990–91. As such, "[t]he Federal Circuit's extensive discussion of the exchange evidence demonstrates that this [c]ourt can use the evidence from trial, including the Graves model . . . , to conclude that SMUD would have been out of fuel no later than 2003 and that no wet pool or other offset is appropriate." Pl. Mot. at 5. In addition, "[i]n both *Pacific Gas* [*& Electric Co. v. United States*, 668 F.3d 1346 (Fed. Cir. 2012) ("*PG&E*")] and *Yankee Atomic* [*Electric Co v. United States*, 679 F.3d 1354 Fed. Cir. 2012)] the Federal Circuit adopted the full exchange model proffered by . . . Mr. Graves, both for purposes of determining each utility's fuel-out dates and hypothetical exchange costs." Pl. Reply at 6. Moreover, "[t]he fact that the Federal Circuit has critically examined and accepted Mr. Graves' analysis despite a decade of [G]overnment criticism over many SNF cases, and that he has subjected his own analysis to additional sensitivities in each case . . . , provide significant confidence and certainty in his results." Pl. Mot. at 6.

In sum, "[b]ased on Federal Circuit decisions and the extensive evidence, exchanges would have occurred in the non-breach world." Pl. Mot. at 6 (citing *Yankee Atomic*, 679 F.3d at 1359–60; *PG&E*, 668 F.3d at 1353–55; *Dairyland Power Coop. v. United States*, 645 F.3d 1363, 1371 (Fed. Cir. 2011)). And, SMUD previously "proved that it would have been out of fuel by 2003 at the latest." Pl. Mot. at 7 (citing PX 6350 (Graves Written Direct); Pl. Post-Trial Br. at 50–56). "The [G]overnment offered no contrary evidence on the fuel-out date[.]" Pl. Mot. at 7 (citing *SMUD VIII*, 566 Fed. App'x at 991).

#### 2. The Government's Response.

The Government responds that the United States Court of Appeals for the Federal Circuit "found that it had 'substantially addressed the viability of exchange models to prove what would

have happened in the non-breach world in SNF cases,' . . . . [but it] did not direct the Court to reach a specific outcome based upon the Federal Circuit's prior exchanges-related decisions[.]" Gov't Resp. at 9–10 (quoting *SMUD VIII*, 566 Fed. App'x at 994). Therefore, the court should "completely reject or severely discount SMUD's exchange theory[.]" Gov't Resp. at 10. Even though the United States Court of Appeals for the Federal Circuit also has decided that exchange markets would be viable, "many utilities did not consider exchanges to be viable and likely would have avoided participating" in them. Gov't Resp. at 10–11 (citing 8/12/09 TR 592–602 (David Zabransky Testimony in *Yankee Atomic*)). This is so, because DOE had total discretion as to whether to approve exchange requests; thus, there is no guarantee an exchange market would ever have developed. Gov't Post-Trial Resp. Br. at 41–42.

In addition, the Government argues that *Dairyland* does not support SMUD's exchange theory. Gov't Resp. at 11–13. Although the *Dairyland* court agreed with, and the United States Court of Appeals for the Federal Circuit affirmed, Mr. Graves' theory, that trial court awarded plaintiff only half the cost it expected to receive. *See Dairyland*, 90 Fed. Cl. at 636 ("[E]xchanges would have cost Dairyland half of its claimed . . . damages. The Court will offset Dairyland's . . . damages by that amount and award Dairyland the other half[.]"). This is because the *Dairyland* court was concerned about the statistical reliability of Mr. Graves' model. *Id.* at 634 ("Mr. Graves's study clearly cannot be given the same weight that a statistically-sound one would be afforded."). Therefore, the *Dairyland* court determined that "Mr. Graves's $2 million estimate [of the cost for Dairyland to purchase acceptance allocations] requires substantial upward adjustment." *Id.* at 635. In addition, the Government notes that *Dairyland* had a "relatively small quantity of SNF," making an exchange system more likely to work. Gov't Resp. at 13 (citing *Dairyland*, 90 Fed. Cl. at 634). In contrast, in this case, SMUD had much more SNF to exchange and "would have to advance more years in the DOE acceptance queue" than *Dairyland*. Gov't Resp. at 13 ("Rancho Seco would have had to exchange far more tons of SNF (228.8 MTU) than had to be exchanged in *Dairyland* (31.6 MTU).").

The Government also continues to argue that Mr. Graves' model is flawed. Gov't Resp. at 14–16. First, "Mr. Graves' spent fuel storage cost estimates . . . are the product of an insufficient and unreliable data sample that yields erroneous results." Gov't Resp. at 14. Second, Mr. Graves "employs the same maximum capacity data that were excluded by the [United States Court of Federal Claims in a prior case] as unreliable." Gov't Resp. at 14 (citing *Kan. Gas & Elec. Co. v. United States*, 95 Fed. Cl. 257, 290 (2010), *aff'd in part, rev'd in part*, 685 F.3d 1361 (Fed. Cir. 2012)). Third, "Mr. Graves biases his model in favor of alleged buyers of exchanges." Gov't Resp. at 15. Fourth, Mr. Graves "relies upon various factually unsupported and speculative assumptions[.]" Gov't Resp. at 16. For instance, Mr. Graves: "failed to . . . identify any utility that would 'decelerate' its own SNF acceptances by selling early allocations"; "assumes that *every* nuclear utility would be willing to trade their DOE allocations"; "unrealistically assumes away the risk and uncertainty in his model"; "assumes DOE's approval for *all* proposed exchanges"; and "assumes perfect competition among parties engaging in exchanges." Gov't Resp. at 16–17.

5

3. **The Court's Resolution.**

In *SMUD VIII*, the United States Court of Appeals for the Federal Circuit stated:

[I]n *Dairyland*, this court *substantially addressed the viability of exchange models* to prove what would have happened in the non-breach world in SNF cases. Specifically, in *Dairyland*, this court approved a damages theory relying on evidence and expert testimony [of Mr. Graves] that a market would have existed in the non-breach world for exchanging acceptance slots to adjust delivery schedules, and that such exchanges were foreseeable in view of the standard contract's "Exchanges" provision.

566 Fed. App'x at 994 (emphasis added).

In this case, as in *Dairyland* and other SNF/HLW cases, the Government elected not to present the court with an alternative exchange model. *See SMUD VIII*, 566 Fed. App'x. at 991; *see also Dairyland*, 645 F.3d at 1370; *see also Yankee Atomic*, 94 Fed. Cl. at 700, *aff'd in relevant part*, 679 F.3d at 1359 ("[T]he Government did not identify any record evidence to support a finding that the trial court committed clear error in adopting an exchanges model."). This is because the Government viewed SMUD's hypothetical expert exchange model as speculative, since there would have been no exchange markets in the "but-for world"[4] without DOE's prior approval.[5] It is reasonable to assume that DOE would exercise its sole discretion by putting public safety concerns first and disposing of SNF and HLW in an orderly manner, as contemplated by

---

[4] *See SMUD III*, 70 Fed. Cl. at 375 ("To accept SMUD's position [that it would have utilized an exchange market], the court would need to speculate about whether SMUD would have been successful in trading SMUD's acceptance priority with another utility or convincing DOE to accept SMUD's SNF early. The law does not permit the court to do so.").

[5] The Standard Contract provides:

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; *provided, however*, that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges*. Not less than six (6) months prior to the delivery date specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

10 C.F.R. § 961.11, art. V.E (emphasis in original and added).

6

the OFF schedule, instead of in an order decided by private parties, based on their perceived view of expected efficiency gains.

The fact that former DOE employees and a consultant hired by SMUD testified otherwise, 109 Fed. Cl. at 670–71 (citing SMUD's witness), is irrelevant. *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989) ("Officials no longer serving with an executive branch department cannot continue to disclose official agency policy, and certainly they cannot establish what *is* agency policy through speculation, no matter how reasonable it may appear to be."); *cf. Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 865 (1984) (noting that the Government's view of what constitutes wise policy may vary from administration to administration). Nor did SMUD proffer any current DOE official with authority to bind the agency that testified what DOE's policy would be. They could not, because that policy had not been determined. Nor had any utility requested to know what that policy would be. Certainly, if exchanges were paramount in the minds of the utilities with SNF and HLW, one would assume at least one of them would have written DOE to obtain policy guidance. Of course, that did not happen either. Therefore, the existence of Article V.E of the Standard Contract, affording DOE sole discretion as to whether to approve exchanges, and Mr. Zabransky's testimony countering each of SMUD's proffered evidence, including Mr. Graves' model,[6] 109 Fed. Cl. at 171–72, traditionally would be viewed as sufficient to shift the evidentiary

---

[6] Mr. David Zabransky, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE, testified based on his prior employment at Wisconsin Electric Power Company from 1980 to 1994, that public utilities were not interested in exchanging SNF. 8/12/09 TR 561, 593–597 ("So in the early years, we were not interested in exchanging. . . . And until you knew that there was a good track record that you could rely upon, . . . it would be imprudent or viewed as imprudent by your regulator that you had given away this early allocation. . . . [W]e weren't going to do an exchange[.]").

In addition, Mr. Zabransky testified that it would have been unrealistic politically for DOE to allow exchanges of SNF. 8/12/09 TR 594 (Zabransky Testimony in *Yankee Atomic* and admitted in this case, *SMUD VI*) ("I will tell you right now from my years in the [nuclear] industry, every state is an activist state when it comes to getting nuclear fuel out of its boundaries. No state wants the fuel there longer. And it doesn't matter that it is some fuel in the pool or all the fuel in dry storage. They want it out of the state[, s]o that if you were going to take the position [of accepting SNF,] you were going to risk a lot of political capital by jeopardizing your relationship with your neighbors[.]"); *see also* 8/12/09 TR 596 (testifying about whether DOE agreed to exchanges or not, the state regulatory authorities also would have to approve, *i.e.*, DOE would not have the last word); *see also* 8/12/09 TR 616 (testifying that public utilities did not always cooperate); *see also* 8/26/11 TR at 65–66 (testifying that the uranium exchanges were not "doing too well"); *see also* 8/12/09 TR 597 ("And what I heard Mr. Graves say was, oh, leaving a little fuel there wouldn't matter, you had to all move and no one really cared. That's not the case.").

Moreover, Mr. Zabransky testified that SMUD's hypothetical efficiency gains had not been ascertained or quantified by DOE. *See* Gov't DOE Counter-Designations Att. A (Zabransky 10/09/09 TR at 711–12 (*Pac. Gas & Elec. Co. v. United States*, Case No. 04-0074C ("What is

7

burden of proof back to SMUD or at least place the parties in equipoise.[7]  Moreover, allowing potential exchanges to be considered as a factor in determining reliance damages seems to depart from the usual rule that only relevant evidence is admissible.  *See* FED. R. EVID. 402 ("Irrelevant evidence is not admissible.").  This would further appear to be important where the damage payments will be made from the public's purse.  But, since the United States Court of Appeals for the Federal Circuit appears to view Mr. Graves' model as dispositive evidence that an exchange market would have existed, 566 Fed. App'x at 994 ("in light of this court's . . . acceptance of damages theories relying on the use of exchange models, *e.g.*, *Dairyland*, 645 F.3d at 1370"), the court is required to adopt that finding as well.

        **C.**        **What Plaintiff's Specific Fuel-Out Date Would Have Been.**

            **1.**        **SMUD's Argument.**

SMUD argues that the fuel-out date would likely have been in 1999, but under no circumstance later than 2004.  Pl. Post-Trial Resp. Br. at 20–21 ("[T]he evidence establishes that utilities would have engaged in exchanges and that SMUD would have been able to achieve acceptance of all of its SNF by 2004. . . .  Mr. Graves opines in his Base Case analysis that SMUD would have exchanged with other utilities in order to have all of its SNF removed in 1999, at a cost of $8.4 million.").

SMUD again emphasizes that Mr. Graves' model is a conservative view of the non-breach world.  Pl. Post-Trial Resp. Br. at 22–25.  For example, his model: "assumes that every utility

---

efficient for one party maybe [sic] inefficient for another.  So it really . . . depends upon the specifics of who is making the judgment as to whether something is efficient or not.")).

[7] The evidentiary burden of production is distinct from the burden of persuasion.  *See* 2 MCCORMICK ON EVIDENCE § 337 (7th ed.) (2013) ("[T]he burdens of producing evidence and of persuasion . . . are both generally allocated to the same party. . . .  However, the initial allocation of the burden of producing evidence may not always be final.  The shifting nature of that burden may cause both parties to have the burden with regard to the same issue at different points in the trial."); *see also Dir., Office of Workers' Comp. Programs, Dept. of Labor v. Greenwich Collieries*, 512 U.S. 267, 272 (1994) (explaining the historical confusion about the burden of production—"a party's obligation to come forward with evidence to support its claim"—and the burden of persuasion—"the notion that *if evidence is evenly balanced, the party that bears the burden of persuasion must lose*") (emphasis added); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 499, 511 (1993) (holding that "if reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact *does* remain, which the trier of fact will be called upon to answer") (emphasis in original); FED. R. EVID. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption.  But this rule does not shift the burden of persuasion, which remains on the party who had it originally.").

The appellate court did not have the benefit of this explanation prior to issuing its June 20, 2014 Opinion, because the trial court determined that a reconsideration of the issue of exchanges was precluded as a matter of law.  *See SMUD VII*, 109 Fed. Cl. at 676–80.

8

facing a storage constraint only has the most expensive option of building new long-term storage facilities"; "assume[s] that operating utilities would have maintained a full core reserve or 'FCR'— sufficient space in the wet pool to accommodate a discharge of all fuel in the reactor"; treats some other utilities as shutdown in the 1990s "to the detriment of SMUD because they compete for early SNF removal rights"; and "tak[es] into account the multiple sensitivities considered by Mr. Graves, even the most pessimistically biased." Pl. Post-Trial Resp. Br. at 22–25 (some internal quotation marks and citations omitted).

### 2. The Government's Response.

The Government responds that "SMUD failed to prove that DOE would have removed all the SNF from Rancho Seco earlier than 2008, the same year that SMUD would have received its final acceptance allocations under the [OFF] schedule at the 1987 Annual Capacity Report (ACR) rate." Gov't Resp. at 1–2. The Government's remaining arguments previously were discussed in the discussion of exchange markets.

### 3. The Court's Resolution.

Based on SMUD's evidence that the final fuel-out date was no later than 2004, the court has determined that the "specific" fuel-out date is January 1, 2004. *See SMUD VIII*, 566 Fed. App'x at 994.

### D. The Mitigation Costs To Which Plaintiff Is Entitled As Damages.

### 1. Governing Precedent.

"The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Such damages "are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Id.* In a suit for partial breach, however, "a claimant may not recover . . . prospective damages for anticipated future nonperformance resulting from the same partial breach." *Id.* at 1376. In addition, a "non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003). But, "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003).

To ascertain whether mitigation costs claimed by the nuclear utility-parties to the Standard Contract were incurred because of DOE's partial breach of the Standard Contract, the court is required to make a "comparison between the breach and non-breach worlds." *Yankee Atomic*, 536 F.3d at 1273; *see also Energy Nw. v. United States*, 641 F.3d 1300, 1305 (Fed. Cir. 2011) ("It is only by comparing this hypothetical 'but-for' scenario with the parties' actual conduct that a court can determine what costs were actually caused by the breach, as opposed to costs that would have been incurred anyway."). To conduct this comparison, the Government "must move forward by pointing out the costs it believes the [nuclear utility] plaintiff avoided because of [DOE's] breach[.]" *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011). But,

"with respect to both claimed costs and avoided costs, [the nuclear utility-party to the Standard Contract] bear[s] the burden of persuasion." *Id.*  Therefore, "a plaintiff seeking damages must submit a hypothetical model establishing what its costs would have been in the absence of breach." *Energy Nw.*, 641 F.3d at 1305; *see also id.* at 1308 ("[T]he burden of proving the non-breach world" lies with the plaintiff); *S. Nuclear*, 637 F.3d at 1304 ("As we held in *Yankee Atomic*, '[b]ecause plaintiffs . . . are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world.'" (quoting *Yankee Atomic*, 536 F.3d at 1273)).  But, "[i]f a cost would have been incurred even in the non-breach world, it is not recoverable." *Energy Nw.*, 641 F.3d at 1307.  Likewise, a cost that would have been incurred in the non-breach world that has not been incurred in the breach world, *i.e.*, an avoided cost, is required to be offset against a plaintiff's recovery.  *See Carolina Power & Light Co. v. United States*, 573 F.3d 1271, 1277 (Fed. Cir. 2009) (differentiating between "avoided" and "deferred" costs).

### 2. Costs Incurred From January 1, 2004–December 31, 2009 That The Court Awarded In *SMUD VII*.

The court previously determined that SMUD "is entitled to $20,703,595 for costs incurred to mitigate" the Government's partial breach from 2004–2009.[8]  *See SMUD VII*, 109 Fed. Cl. at 708.  In this proceeding, the parties do not dispute the specific costs that comprise this amount, although the Government argues that overall damages should be reduced for various reasons that are discussed below.

### 3. Costs Incurred From January 1, 2004–December 31, 2009 That The Court Did Not Award In *SMUD VII*.

The court previously denied four categories of costs for the period of January 1, 2004 to December 31, 2008: NRC Part 171 fees; NEI fees; increased ANI premiums; and costs incurred to construct the Cosumnes Power Plant.  *See SMUD VII*, 109 Fed. Cl. at 694, 685, 687–88.  Each is now reconsidered.

#### a. Nuclear Regulatory Commission Part 171 Fees.

NRC Part 171 fees "annually are charged to all nuclear utilities that have not permanently ceased operations or that still have nuclear fuel onsite." *SMUD VII*, 109 Fed. Cl. at 691.  SMUD permanently ceased operations in 1989.  *Id.* at 665.  Thus, the relevant inquiry is whether SMUD would have had nuclear fuel onsite from January 1, 2004 to December 31, 2008 in the non-breach world.  *See id.* at 692.  The record shows that SMUD requested $938,000 in NRC Part 171 fees during that period.  *See id.* at 691.  The court awarded SMUD $118,750 in fees for 2009, but denied $819,250 in fees for January 1, 2004 to December 31, 2008.  *See id.* at 693–94.

Nuclear utility sites that do not have any fuel onsite are not charged NRC Part 171 fees.  *See* Final Rule, 64 FED. REG. 31,448, 31,455 (June 10, 1999) (Part 171 fees "will not be assessed to those reactors that have permanently ceased operations and have no fuel onsite.").  Because the

---

[8] For evidence presented and the court's determinations on specific mitigation costs, refer to *SMUD VII*, 109 Fed. Cl. at 670–708.

court has determined that SMUD's fuel-out date would have been January 1, 2004, SMUD would not have had nuclear fuel onsite thereafter. The Government has not challenged SMUD's assertion that it paid $938,000 in NRC Part 171 fees from January 1, 2004 to December 31, 2008. Thus, SMUD is entitled to $819,250 in NRC Part 171 fees for that period.[9]

### b. Nuclear Energy Institute Fees.

SMUD also requests $847,070 for NEI fees. *See SMUD VII*, 109 Fed. Cl. at 685. The court awarded SMUD $311,543 in NEI fees for 2009, but denied the remaining $535,527 in fees for January 1, 2004 to December 31, 2008. *Id.* The Government argues that "SMUD's NEI dues are not solely related to SNF storage, but are also related to nuclear decommissioning and the disposal of Class B and C radioactive waste." Gov't Post-Trial Br. at 45–46. But, the court already determined that "SMUD's decommissioning would have been completed (as it was in the real world), and SMUD's class B and C waste would have been removed offsite prior to or during 2008." *SMUD VII*, 109 Fed. Cl. at 685. That determination was not challenged here.

Because the court now has determined that SMUD's fuel-out date would be January 1, 2004, SMUD would not have had to pay NEI fees after that date. Therefore, SMUD is entitled to $535,527 in NEI fees for the period January 1, 2004 to December 31, 2008.

### c. Increased American Nuclear Insurers Premiums.

The court also previously awarded SMUD $371,880 in ANI premiums for 2009, but denied $410,714 in additional premiums for January 1, 2004 to December 31, 2008. *See SMUD VII*, 109 Fed. Cl. at 686–87. SMUD would have paid *some* ANI premiums from January 1, 2004 to December 31, 2008, even if all its fuel were gone. *See id.* at 686 ("SMUD concedes that it would have maintained some ANI insurance coverage for on-going decommissioning activities at Rancho Seco."). But, SMUD would not have been required to pay $410,714 in additional premiums for that period if no fuel were onsite. *See id.* at 687.

Because the court has determined that SMUD would have had no fuel onsite after January 1, 2004, SMUD is entitled to $410,714 in ANI fees.

### d. Costs Incurred In Relation To Construct The Cosumnes Power Plant.

The Cosumnes Power Plant is a natural gas-fired power plant about a half-mile south of Rancho Seco that is owned by SMUD and was brought online in 2006. *See SMUD VII*, 109 Fed. Cl. at 687. In 2004, SMUD spent $51,473 to study the impact of a potential explosion of the Cosumnes Power Plant on its SNF. *See id.* at 688. The court previously denied $51,473 in costs related to that study. *See id.* ("SMUD would not have removed its SNF offsite until 2008. As

---

[9] On remand, the relevant period is January 1, 2004–December 31, 2008, because the court previously determined that SMUD was entitled to certain costs for 2009. *See SMUD VII* at 693–94.

11

such, in the non-breach world, SMUD was required to undertake the potential explosion analysis in anticipation of the Cosumnes Power Plant going online in 2006.").

Because the court has determined that SMUD's fuel-out date would be January 1, 2004, SMUD is entitled to $51,473 in costs related to analyzing the effects of a potential Cosumnes Power Plant explosion.

### 4. Whether SMUD's Damages Should Be Reduced Due To Operating Its Wet Pool From January 1, 2004 To December 31, 2008.

The Government argues that SMUD's damages must be reduced by the cost of operating its wet pool from 2004 through 2008, because SMUD did not establish at trial that DOE would have removed all of its SNF and HLW prior to 2008. Gov't Resp. at 7 ("SMUD's damages must be reduced by *at least* [$4.2 million] for each year from 2004 through 2008 that the SNF would have remained at Rancho Seco.").

Because the court has determined that SMUD's fuel-out date would be January 1, 2004, SMUD would not have needed to operate one thereafter, and there would be no need for a wet pool reduction.

### 5. Whether SMUD's Damages Should Be Reduced To Account For Exchange Costs That SMUD Would Have Incurred.

The Government also argues that "SMUD's damages claim should be reduced by the cost that SMUD would have incurred to purchase DOE allocations in the exchanges market." Gov't Resp. at 18. The Government cites *Dairyland* for the proposition that "the Federal Circuit confirmed that a plaintiff's damages must be reduced to account for these exchange costs." Gov't Resp. at 18 (citing 645 F.3d at 1372).

SMUD responds that "no offset is appropriate in this case because even with a damage award of $22.5 million, SMUD will still be in a worse economic position than it would be had the [G]overnment performed." Pl. Reply at 17. SMUD points to *Yankee Atomic*, where the court did not offset exchange costs for two of the plaintiffs, in light of the Graves model that showed that no net exchange costs would have occurred in the non-breach world. Pl. Reply at 18. SMUD insists that it is "not arguing for zero costs for exchanges, but rather is arguing that, because it never recovered its wet pool costs for 1999 through 2003 . . . its damage claim is already lower than it should be if all costs, incurred and avoided, are taken into account." Pl. Reply at 21. If the court awards an offset for exchange costs, "the [G]overnment will benefit from a windfall or double deduction for each year and SMUD will be penalized for not seeking its additional wet pool storage costs from 1999 to 2002." Pl. Reply at 21.

As a matter of law, the United States Court of Appeals for Federal Circuit has held that the non-breaching party should not be "placed in a better position through the award of damages than if there had been no breach." *Bluebonnet Sav. Bank*, 339 F.3d at 1345. Moreover, in this case, our appellate court held that the court should not carry over damages calculations by reducing damages determinations from past cases or increasing offsets in future cases. *See SMUD VIII*, 566 Fed. App'x at 996–97 (holding that *Indiana Michigan* "limits the [Government's] ability to obtain future offsets," and that "the $53,139,863 awarded for mitigation costs incurred by SMUD from

12

1992 to 2003 should have remained untouched"). Therefore, the court will rule only on damages or offsets that occurred during the relevant time in the September 4, 2009 Complaint, *i.e.*, January 1, 2004 to December 31, 2009.

In their arguments regarding exchange costs, both parties rely on facts or hypotheticals that predate 2004. *See, e.g.*, Gov't Resp. at 18 ("SMUD's damages claim should be reduced by the cost that SMUD would have incurred to purchase DOE allocations in the exchanges market."). As described above, the court determined that SMUD's fuel-out date would have been January 1, 2004. Whatever costs SMUD would have incurred to purchase DOE allocations in the exchange market would have happened prior to 2004. Similarly, SMUD urges the court to consider the fact that it did not seek wet pool storage costs for 1999 to 2002. Pl. Reply at 21. Pursuant to *SMUD VIII*, however, the court is required to consider only what (if any) exchange costs SMUD would have incurred between January 1, 2004 and December 31, 2008. Based on a fuel-out date of January 1, 2004, whatever exchange costs SMUD incurred would have happened prior to that time, and whatever pre-2004 costs SMUD sought or failed to seek are irrelevant. Thus, the court will not award the Government any offset for exchange costs.

*Dairyland* does not change this conclusion. In that case, the court awarded wet pool storage costs for 1999 to 2006, based on a fuel-out date of 1998. *See Dairyland*, 645 F.3d at 1369. But, it also reduced the plaintiff's wet pool storage costs by half, because it concluded that it would have cost the plaintiff about half its damages to exchange its fuel on the market. *See id.* at 1371–72. The critical difference between this case and *Dairyland* is that the *Dairyland* court determined damages and offsets for actions that took place from the time of breach, *i.e.*, 1998 to 2006. *See* 90 Fed. Cl. at 617 ("Dairyland has limited its damages claims to costs incurred through December 31, 2006."). In addition, in *Dairyland*, the relevant damages period covered the time when the plaintiff would have paid to exchange its fuel on the market. *See id.* at 626 (determining that DOE would have picked up all of Dairyland's SNF by early 2006); *see also id.* at 632 ("The Court is convinced that a viable exchanges market would have developed in the non-breach world in advance of the SNF acceptance start in 1998[.]"). Thus, it was appropriate in *Dairyland* to factor exchange costs into total damages. Here, however, the relevant damages period does *not* cover the time when SMUD would have paid to exchange its fuel. Thus, any exchange market offsets that might have been applied to pre-2004 damages are not relevant. *See SMUD VIII*, 566 Fed. App'x at 997 ("[T]his court further reinstates the award to SMUD of $53,139,863 for costs incurred to mitigate from January 1, 1992 to December 31, 2003[.]").

### III. CONCLUSION.

For the reasons discussed herein, the court has determined that SMUD is entitled to $20,703,595 in mitigation costs for the period of January 1, 2004 to December 31, 2009 that were previously awarded in *SMUD VII*.

In addition, SMUD is entitled to: $819,250 in NRC Part 171 fees; $535,527 in NEI fees; $410,714 in ANI premiums; and $51,473 in costs related to analyzing a potential Cosumnes Power Plant. In sum, SMUD is entitled to a total of $22,520,559 for mitigation costs.

      SMUD's August 14, 2014 Motion For Recalculation Of Damages And Entry Of Judgment is **granted**.  The Clerk of the United States Court of Federal Claims is directed to enter final judgment in Case No. 09-587C in favor of Plaintiff Sacramento Municipal Utility District in the amount of $22,520,559 for costs incurred from January 1, 2004 to December 31, 2009.

      **IT IS SO ORDERED.**

                                                              /s/ Susan G. Braden
                                                              **SUSAN G. BRADEN,**
                                                              **Judge.**